UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
TEAM DML INC.,                                            Docket No.

                                    Plaintiff,            **COMPLAINT**

                    -against-

BEEHIIV INC., BRIAN SCHNEIDER
and TYLER REID DENK,

                                    Defendants.
-------------------------------------------------------------------X

  Plaintiff Team DML Inc. (the "Plaintiff"), by and through its attorneys, Romano &

Associates, as and for its Complaint against defendants Beehiiv Inc. ("Beehiiv"), Brian Schneider

("Schneider") and Tyler Reid Denk ("Denk") (collectively, the "Defendants"), respectfully alleges

as follows, upon information and belief:

## NATURE OF THE ACTION

  1.  This is an action sounding in breach of contract and fraud based on Defendants

feigning allegations against Plaintiff and its president, Dennis Michael Lynch, as false justification

for their improper failure to pay monies owed by Beehiiv to Plaintiff and creating a false basis to

"fire" Team DML from Beehiiv.

## PARTIES

  2.  At all times hereinafter mentioned, Plaintiff was and is a Florida corporation with

a principal address at 2050 13th Avenue, Unit #2456, Vero Beach, Florida 34997. For the purposes

of diversity, Plaintiff is a resident of Florida.

  3.  At all times hereinafter mentioned, Beehiiv was and is a Delaware corporation

domiciled in—and actually transacting business in—the State of New York, with an address at

1

228 Park Avenue, #29976, New York, New York 10003.  For the purposes of diversity, Beehiiv is a resident of New York.

4.     At all times hereinafter mentioned, Schneider was and is an individual resident of the State of Connecticut, with a home address in Hartford, Connecticut and an address for service or process c/o Beehiiv Inc., 228 Park Avenue, #29976, New York, New York 10003.  Schneider holds the position of "Senior Revenue Lead" at Beehiiv.  For the purposes of diversity, Schneider is a resident of Connecticut.

5.     At all times hereinafter mentioned, Denk was and is an individual resident of the State of California, with an address at 1271 Stoner Avenue, #305, Los Angeles, California 90025.  Denk holds the position of "Chief Executive Officer" at Beehiiv.  For the purposes of diversity, Denk is a resident of California.

## JURISDICTION AND VENUE

6.     This action is between citizens of different states.  The amount in controversy, exclusive of interest and costs, exceeds $75,000.00.  Therefore, jurisdiction is based on diversity of citizenship pursuant to 28 U.S.C. §1332.

7.     Venue is deemed proper in this district pursuant to agreement between the parties.  Specifically, the "Terms and Conditions of beehiiv.com" reads, in relevant part, "The exclusive competence to decide on any controversy resulting from or connected to these Terms lies within the courts of the place where the Owner [Beehiiv] is based, as displayed in the relevant section of this document."  The address listed in said document is "228 Park Ave S, New York, NY 10003."

## RELEVANT BACKGROUND FACTS

8.     Defendant Beehiiv, Inc. ("Beehiiv") is an online platform for email newsletter creation, distribution, and hosting of associated websites/landing pages.

9.     In January 2025, Plaintiff launched three themed newsletters (collectively, the "Newsletters"):

- The 47 Report (Jan. 2025): Daily journalistic coverage of the Trump administration;
- DML Health (Feb. 2025): Health and wellness news; and
- The DML Report (Mar. 2025): Daily op-eds by Mr. Lynch, repurposed from Plaintiff's DML News App.

10.    The Newsletters aimed to expand Plaintiff's news business, establishing them as the core of its publishing and revenue generation.  Plaintiff chose newsletters to address social media algorithm changes, high mobile app maintenance costs, and declining trust in platforms featuring AI-generated content. As a publisher, Plaintiff relied on Defendant's marketing—including the Beehiiv Media Collective (announced November 2024; cohort launched January 2025)—touting Beehiiv as ideal for journalists and small businesses, providing control over content, distribution, revenue, and trusted global reach.

11.    To scale the Newsletters into substantial global publications, Plaintiff—a family-run business with limited staff—relied exclusively on Defendant's promised marketing and practices, fully committing its time to scaling and stabilizing them while forgoing other initiatives (e.g., podcast expansion, new app/website) and risking $1M+ annual revenue.

12.    On January 2, 2025, Mr. Lynch spoke by phone with Daniel Berk, Defendant's Senior Sales Manager, who specializes in onboarding publishers with 100,000+ subscribers.

13.    With Plaintiff's 107,000 opt-in subscribers, many of them paying customers, Plaintiff exceeded this threshold.

14.    Plaintiff expressed to Berk his ambition to become Beehiiv's largest customer and outlined plans for the three Newsletters.

15.    Mr. Lynch informed Defendant that Plaintiff chose Beehiiv as its email service provider due to Denk's self-promoted reputation as a transparent entrepreneur offering industry-leading tools for growth, as highlighted on numerous podcasts and social media outlets.  For instance, on January 13, 2025, while Plaintiff was in initial communications with Beehiiv, Denk posted on X: "The future of media the @beehiiv Media Collective the roster is stacked with only a few spots remaining... health insurance, legal coverage, VIP support, growth budget, Getty Images, strategy sessions concierge onboarding additional software."

16.    Beehiiv offered an ad-revenue estimator tool on its website that, factoring in high engagement metrics such as open rates, led Plaintiff to believe it could earn more than $50,000 per month using its current list of 107,000 subscribers if sending daily newsletters.  When Mr. Lynch spoke to Berk about his objective to steer his entire business towards newsletter publishing and therefore generate millions of dollars in annual revenue, Berk acknowledged the online tool could be a bit misleading and that he wanted to revamp it, but then assured Lynch revenue opportunities would be significant, going as far as raving about other publishers who were "crushing it" and leading Lynch to believe the biggest newsletter publisher in the world, The New York Times, was on the cusp of becoming a Beehiiv customer.

17.    Berk touted how Denk had raised $33,000,000 in a Series B investment round and was investing heavily in the Beehiiv Ad Network, assuring Lynch that Plaintiff could generate huge dollar amounts within the next twelve months

18.    Berk, recognizing Mr. Lynch as a veteran filmmaker, TV personality, and journalist, explained how Plaintiff's business model could include sending emails with advertisements ("ads") brokered by Beehiiv, whereby Beehiiv would pay Plaintiff a certain amount

per user's "click" (also known as "Cost Per Click" or "CPC") or "open" (also known as "Cost Per Thousand Opens" or "CPM") on each such advertisement.

19.    Excited to start, Mr. Lynch asked Berk about the Beehiiv's platform costs.  Initially, Berk proposed that Mr. Lynch consolidate his three distinct Newsletters into a single "enterprise" account costing approximately $9,500.00 per year.  This account included a guarantee of four ads from the Beehiiv Ad Network, which Plaintiff would place in the newsletter, earning revenue through CPC or CPM arrangements agreed upon with Beehiiv prior to publication.  Additionally, Berk advised gradually uploading Plaintiff's 107,000 email contacts to avoid triggering spam complaints.  Mr. Lynch rejected the idea of combining the Newsletters into a single account due to their differing content, but agreed to Berk's suggestion to proceed cautiously.  Instead of paying $9,500 for an enterprise account, Mr. Lynch opted for separate lower-tier plans for each Newsletter, despite the higher immediate costs, and the long-term cost being far greater for three separate Newsletters.  To protect each domain's reputation, Lynch planned to import emails in batches of approximately 10,000 every few weeks for each account.  Mr. Lynch knew this strategy would cost Plaintiff approximately $1,500.00 per month (as opposed to approximately $790.00 per month for an "enterprise" plan) in the short term and that, in the long-term, Plaintiff would likely have to pay $9,500.00 annually for each of its three newsletters (nearly $30,000 annually) versus $9,500.00 total for the consolidated approach he rejected.

20.    Mr. Lynch also told Berk that Plaintiff would like to be an advertiser on the Beehiiv Ad Network, possibly committing up to a minimum of $120,000.00, and a maximum of $1,000,000.00 annually if the platform performed as well as promised by Defendants.

21.    Although Berk represented that Defendants would guarantee four (4) ads assigned to each account, he claimed that more than four ads were likely to be given each month if the

Newsletters performed well.  Mr. Lynch assured Berk that his email subscribers would be very active considering past successes and the closely tied political leanings they shared.  Mr. Lynch also explained that many of his subscribers are paying customers and had been enjoying and sharing his content for well over a decade, dating all the way back to when Mr. Lynch was a regular guest on Fox News and a host on Newsmax between 2010-2016.  Mr. Lynch asked Berk if Beehiiv could increase the guaranteed number to ten (10) ads per account in exchange for a guarantee that Plaintiff would advertise on the Beehiiv Ad Network.  Berk would not commit to the increase but still referred Mr. Lynch to Jake Schonberger ("Jake"), who leads the advertising division of Beehiiv, to speak more about Plaintiff spending money with the Beehiiv Ad Network

22.     On or about January 8, 2025, Mr. Lynch and his three adult children, who work with him, held a conference call with Jake.  Wanting to secure Plaintiff as an advertiser, Jake agreed to give Plaintiff the requested ten (10) ads per Newsletter for two consecutive months (60 days).  When Mr. Lynch later informed Berk of Jake's offer and asked for it to be written into a formal agreement, Berk became infuriated and rejected the oral agreement made between Jake and Mr. Lynch, stating that Mr. Lynch would be given thirty (30) days only.  When Mr. Lynch challenged Berk via email, stating Jake had made the offer and it should be honored, Berk wrote the following to Mr. Lynch via email: "If that doesn't work I'm sorry. I know you've been reviewing other platforms and perhaps what they can offer you is in better alignment with your business strategies."

23.     Mr. Lynch responded, in relevant part: "All four of us heard Jake tell us, twice, that we would get two months with 10 ads guaranteed."

24.     Berk emailed Mr. Lynch back: "Sorry for the miscommunication… Being that we can't guarantee what you require in ad opportunities to move forward, it appears Beehiiv is not the

best fit for you at this time."

25.     Mr. Lynch responded the next day: "Politely speaking: There was no miscommunication, Daniel."

26.     Days passed without a response from Berk.  Mr. Lynch followed up, asking if Berk was going to respond, and received the following reply: "We did some quick analysis and don't think you're going to find the success you're looking for using our platform, so I think looking for alternative platforms is going to be a better fit. Best of luck, and thanks for your patience."

27.     On January 11, Mr. Lynch asked Berk via email, "What quick analysis?"

28.     Berk responded,

We cannot offer you a guarantee because we don't offer guarantees and we don't know anything about your list beyond your open rate due to currently sending on Squarespace. Part of the sales process for us is determining whether or not someone interested in beehiiv is a good fit for us. We don't simply give beehiiv to everyone who wants to buy. We turn people away every single day for countless reasons. Just like you do due diligence, every step of the process is due diligence for us as well. It is unheard of that I would send a guarantee to anyone— including the New York Times themselves— without detailed insight into audience well beyond what you've been able to provide me to date. We can't offer you an ads guarantee. Call it walking back a statement or chalk it up to a misunderstanding. Being that you require terms that we are unwilling to offer, and being that we cannot verify the details of your list in the ways that we require as a platform, I don't think beehiiv is a good fit.

29.     Mr. Lynch responded:

You do see how bizarre this is — right?  For starters, I politely ask you go back and read our chain of emails.  You were aggressively seeking our business — as you should; as any sales rep would.  I simply asked questions about the ad network and the rate to which you offer ads. You used the word "guarantee" not me — go back and listen to the recorded call . . . Bottom line Daniel: We want to move forward with Bee.  If Jake screwed up, so be it. He's a nice young man trying to land an account. I don't hold him accountable; my sons have made similar mistakes by overpromising.  But the emails you're sending appear to tell a different story.  You have gone cold — I cannot understand why at this moment. But I've put a lot of time and energy into this; it feels bizarre that you're pushing us away.

30.     Sensing Berk was trying to keep Plaintiff from the Beehiiv platform for no valid

business reason, Mr. Lynch reached out to Denk, Beehiiv's CEO, via direct message on X, telling Denk that he believed discrimination could be a factor and that despite Berk's strange behavior he would like to move forward with Beehiiv.

31.     Denk responded that he would "dig into it."

32.     On or about January 12, 2025, Jake contacted Mr. Lynch via email, copying Denk and Berk, stating that he had made a mistake and could not offer two months.  Even the ten ads for thirty days guarantee was removed from the deal, but the ability for Plaintiff to join the Beehiiv platform and Beehiiv Ad Network could move forward.

33.     In trying to salvage the relationship, Mr. Lynch, in good faith, agreed to the minimum of four guaranteed ads.

34.     By means of signing up for the platform, Plaintiff agreed to the Beehiiv Terms of Use and Publisher Agreement, thereby entering into a binding agreement with Beehiiv (the "Contract").  Plaintiff planned to officially launch The 47 Report account on Inauguration Day, January, 20, 2025.

35.     On or about January 19, 2025, Plaintiff ran into a problem uploading email addresses.  Mr. Lynch sent an email directly to Denk, stating:

> With tomorrow being the inauguration, and considering we test drove the Beehiiv system all week with an average open rate of 50%, we went to import 26k emails this evening . . . The issue is we received a notice saying it could take 48 hours to get a Beehiiv approval. Is there something that can be done to speed this up?

36.     Denk responded the same day: "Hey Dennis, Just took care of this for you, you should be unblocked and good to go."

37.     The DML Report launched in February 2025.  The DML Health launched in March 2025.  Throughout that time, Plaintiff's success was evident with open rates often exceeding 50%, and in many cases over 60%, thus demonstrating that Plaintiff's email list was authentic and in

line with what Mr. Lynch represented to Beehiiv in January 2025.  Plaintiff was typically offered more than the four ads for each account.  Along the way, when there were questions and technical issues, Mr. Lynch would contact Denk directly, often getting fast replies within a day.  For example, on February 20, 2025, at 10:56 a.m., Mr. Lynch emailed Denk: "Can we inject Google Ads?"  Denk responded within 15 minutes: "Yeah it's on the roadmap…"

38.    Later that day, Mr. Lynch followed up with additional questions, and Denk responded by copying his team of sales and technical personnel.  In one exchange, Berk wrote: "Hey Dennis, It's great to hear from you again! I'm glad we got some of your account questions solved earlier this year before the election, and happy to hear you've been crushing it since."  This sort of back and forth with Denk and his team continued for weeks and, in nearly every case, Denk would copy members of his team with instructions to help Mr. Lynch.  Neither Denk nor anyone from Beehiiv **ever** complained about Mr. Lynch contacting Beehiiv or Denk directly, despite him not being an enterprise client.  Never did they suggest Plaintiff was abusing the Beehiiv platform or engaging in wrongful activity.

39.    On February 20, 2025, Mr. Lynch offered to advertise on Beehiiv at $10,000.00 per month in exchange for being added to the enterprise plan, despite not qualifying for the service level due to not having all his 107,000 emails imported yet, as he was proceeding slowly per Berk's original suggestion.  Berk responded that he would offer Mr. Lynch an enterprise account for $960.00 per month, which was more money than what he had offered in January 2025 but still less than what Mr. Lynch was paying for the multiple accounts.  Mr. Lynch declined the offer, and Berk referred Mr. Lynch to Jake about advertising.

40.    On February 23, 2025, Jake responded to Mr. Lynch, saying it was great to hear from him and that he would look into the request for Plaintiff to advertise on the Beehiiv network.

Regarding providing ads for Plaintiff's newsletters, he wrote: "In the meantime we'll send over a couple more ad network ads that you guys can run / that aren't other publications!"

41.     Plaintiff's revenue via the Beehiiv Ad Network grew from approximately $4,000.00 in February 2025 to approximately $25,000.00 in May 2025 between the three Newsletters.  Along the way, Plaintiff continued to import email addresses to all three accounts. In nearly every case, Mr. Lynch would reach out to Denk for help.  For example, on Saturday, May 24, 2025, Mr. Lynch wrote to Denk via email: "Tyler, I need approval. Got DMLhealth.com, need to have more than 50k on import. Thanks!" Denk replied: "Just bumped your import limit. If you're getting close to 100K subs, I'll loop in Daniel here to assist re Enterprise plans." Berk responded by writing in part: "Hey Dennis! Great to hear from you again, and congrats on growth. When you're close to 100k subs you know where to find me. In the meantime let me know if you have any questions, or of course you can open a support ticket within your beehiiv account."

42.     On June 8, 2025, Mr. Lynch reached out to Denk and Berk via email:

I know the Beehiiv guarantee is 4 ads / month at minimum for Max accounts, and we are HIGHLY appreciative when we land more, but a question has surfaced as we continue to expand our 3 newsletters (56k/48k/35k, all targeting 100k by year end as we SLOWLY import our lists and dabble with Facebook ads). Once we get our full lists imported we will go full throttle. That said, if we add another publication (newsletter) to an existing account (ie, assume DML Health (56k) added another asset to that account called DML Sports), would that new asset also be given 4 minimum ads, for a total of 8 to the account, or does DML Sports need to get its own account w/Beehiiv?

43.     Denk replied to Mr. Lynch and Berk and added Jake: "Nope it should 4 ads /mo minimum per publication, and it should continue to increase in volume of pops over time."

44.     On June 9, 2025, Mr. Lynch reached out to Denk directly, writing:

Going direct to you here. We have been doing the email newsletters w/Bee for a few weeks shy of 6 months. We think we understand it pretty well, and still realize there's more to learn. But I want to turn on the jets. I'd like to try and work a win/win deal with you. We can tailor it if need be, but would you be open to the

following…I prefer keep each newsletter separate even though it costs me more because my model is to build 6 newsletters, with the intent of selling them individually — eventually. With the above in mind, some of the ad deals are great and we deliver well for the sponsor. We are 100% compliant (FTC, etc), and keep very clean lists. Our first three newsletters are all 50% open rate and higher. We will add our 4th in June, 5th in July, both are daily, and the 6th in Aug (weekly pub). One newsletter is 7 days. Two are 6 days. Two are 5 days. One is 1 day. I'd like to do an ad deal with Beehiiv where you provide full ad coverage at 100% fill, or the best you can given inventory, with good mix of ad sponsors, and we return 50% of the monthly revenue back into ads promoting our newsletters on Beehiiv . . . . We can do a 6 month or 1 year deal. So, for sake of example, if the total revenue of all 6 was $60k, we would put $30k back into your ad network each month. What are your thoughts?

45.    In addition, Denk and Mr. Lynch had been trying to set a date for Denk to be a guest on Mr. Lynch's podcast to help promote Beehiiv.  Mr. Lynch had told Denk on multiple occasions that with his large social media following (approximately 2,000,000 followers across all platforms) he could help land new customers for Beehiiv.  Mr. Lynch concluded: "Perhaps we should have a 15 min call, and we should really try to get the podcast complete. I'm rather certain I'll get you new customers."

46.    On June 11, 2025, Denk responded, in relevant part:

I don't think we can commit to the plan re ad network and earn outs. We are actually distancing ourselves a bit from publisher advertisers bc of feedback we're receiving from a lot of publishers (who don't want to promote other newsletters). I can keep thinking on it but the arrangement as outlined I don't think we can support at the moment.

47.    This answer baffled Mr. Lynch as there was no lack of ad opportunities being sent to his three accounts promoting other newsletters.  Denk would later add in a follow-up email: "Congrats on all the success, lets stay in touch. Happy to be a great partner for you."

48.    In another email sent by Mr. Lynch to Denk, Mr. Lynch complained that he could not get Jake to respond to the advertising requests for Plaintiff: "I have tried to work with Jake a few times, he either doesn't take me seriously, or he is the busiest dude in the world. That's fine,

not a complaint, but I would much rather give the ad money to Beehiiv than to Facebook." Denk responded: "just nudged him to take a look and get back to you." Jake appeared to purposely ignore Mr. Lynch as he continuously avoided contact, often making excuses or simply not responding. Mr. Lynch thought this was strange considering the offer being made to pay Beehiiv to advertise.

49.    On or about June 15, 2025, Plaintiff received a strange message from the Beehiiv Ad Network stating that an ad was available to run, only for it later to be removed, claiming it was cancelled. This happened repeatedly for a few days. Mr. Lynch reported this to Denk, Berk, Jake, and others at Beehiiv. He received responses from both Denk and Jake saying there was a glitch in the system and that all issues had been resolved.

50.    At the same time, but separately sent to Mr. Lynch's personal email, Schneider, the Senior Revenue Lead at Beehiiv, was trying to contact Plaintiff about "violations." On June 16, 2025, Schneider wrote:

> Brian here from the beehiiv Ad Network team. We've identified recent newsletter sends from your account that explicitly prompted users to click on ads. This has been flagged internally and is a clear violation of the beehiiv Ad Network terms. To be absolutely clear: you may not encourage, prompt, or ask readers to click on ads in any way. Ads must be presented solely as standard sponsorships, using only the copy and formatting provided by the Ad Network. This policy exists to preserve the integrity of our click data and the trust we've built with advertisers. We're treating this as a first-time issue and not adjusting your current earnings. However, any future violations will result in immediate removal from the Ad Network and full forfeiture of ad revenue associated with those sends. Please confirm that you understand and will comply with these terms moving forward. Let us know if anything is unclear — we're happy to help you stay in good standing.

51.    From January 20, 2025, through June 15, 2025, Defendants **never** complained about any violation of Beehiiv's Terms of Use or any other aspect of Plaintiff's operations. In one of the exchanges between Denk and Mr. Lynch in March 2025, Denk told Mr. Lynch that his extra commentary surrounding ads featured in his newsletter needed to change, even though Mr. Lynch

was mimicking what he saw Denk write in his own newsletter, which is also sent via the Beehiiv

network.  Mr. Lynch agreed to change his approach, and never again did he hear from Denk or

anyone at Beehiiv about violations.

52.    Mr. Lynch replied to Schneider, in part:

We have worked on being fully compliant, and I'm a bit surprised that there was
an issue. Can you send us the date of the content in question. Let us conduct a
prompt review to see what is problematic. Also, do you have a link to your policy
so we can address it all at once. We enjoy and respect our relationship with Beehiiv
and will do whatever it takes to rectify the wording as compliance is our number
one concern.

53.    Schneider responded, in part: "No worries and appreciate the prompt response! It

looks like on recent sends your team has started to add a note at the top of the newsletter that

breaks our terms, see screenshots attached…"

54.    The screenshots displayed the disclaimer Plaintiff was running at the top of its 47

Report Newsletter.  It read: "If you click our sponsor's ad, we get paid ~$1. Your click is important

because it keeps this newsletter free, and it leads you to a site with products or services we deem

valuable. If you click you are under no obligation to buy anything."  The disclaimer was placed at

the top of the Newsletters, with the ad running at the very bottom.  Plaintiff ran the disclaimers not

to encourage clicks, but to be transparent that it was getting paid for placement of the ads.  Mr.

Lynch clearly explained this to Schneider in a follow-up email: "I appreciate the feedback. We

were advised per FTC guidelines to FULLY disclose we are getting paid. Our ad disclaimer box

was a means of going out of our way to tell people there is an ad we are getting paid to run. Do

you have five minutes for a phone call?"  Mr. Lynch sent a second email as a follow up: "Is this

appropriate language as a disclaimer, or are you saying there needs to be nothing?  Because we are

a politically based newsletter, we just want to cover all corners.  "The sponsored ad below helps

keep this newsletter free. If you visit the sponsor you are under no obligation to buy anything and or provide information."

55.     Instead of offering Mr. Lynch guidance regarding Beehiiv's terms and conditions, Schneider referred Mr. Lynch to a third-party newsletter that is not associated with Beehiiv.  He wrote, in relevant, part:

> I am not a lawyer so I would run this by your team but from my understanding you are required to disclose any digital advertising. This can be done in a number of ways, Morning Brew for example does the following: - Primary Sponsorship - comes with the "Presented by" at top as well as "Presented by" at the top of the card including the ad - Market Section Sponsor - says "Sponsored by" - Secondary Sponsorship - comes with "Together with" at the top of the card including the advertisement - Tertiary - comes with a "*" at the end of the ad and a note saying "*A message from our sponsor." - The recommended product has a different note since this is an affiliate partnership NOT a sponsorship so I believe there are slightly different rules here. This is not 1-1 with the ads you are running via beehiiv, they are more similar to the bullets above. You can see today's brew here as an example and some screenshots attached for reference. Again, I am not a lawyer so I would recommend talking with your team about what is required. The difference in everything Morning Brew is doing is there is no encouragement or ask for the click to occur, it is simply saying that the content is coming from an advertiser.

56.     Uncertain and confused about the response, Mr. Lynch responded, in relevant part:

> Ok, we will go on the fact that you guys have looked into this on your end a ton more than we ever would." He continued: "Please know our only intent was and is to be overly compliant. You asked that I confirm that we would not put any additional disclosures aside from Bee's ad copy. Consider it done. Thanks! I see 1440 cancelled an ad opportunity for us. I assume this is due to this conversation.

57.     Schneider replied: "Thanks so much for understanding and being a great partner, really appreciate it! That all sounds good and makes sense - we will get you guys some more ads in the coming days, we have some new campaigns launching soon so more to come!"

58.     Beehiiv continued to send numerous ad opportunities to Plaintiff for all three Newsletters, offering so many that Plaintiff would have to double-up the ads on a single publication on some days. Revenue for all three publications for the month of June was on target to exceed

$40,000.00 and possibly scale past $50,000.00. This was in large part due to many of the ad opportunities offering higher CPC rates and better offerings from an array of interesting brands that matched well with the Newsletters.  For example, advertiser Pique offered specials on green teas that appealed to Plaintiff's DML Health Newsletter; the Pique ads paid greater than $3.00 per click.  Another example was Inspired Financial, which offered retirement advice.  Its content aligned perfectly with Plaintiff's readership, the majority of which consists of people aged 50 and older.  Its ads were also priced at $3.00 or more per click.  These ads commonly drew thousands of clicks per day.

59.    Mr. Lynch looked further into the disclaimer issues by researching the laws concerning email and online marketing, advertisements, and paid promotions.  If Mr. Lynch had personally used the service or product, he would mention such clearly. Furthermore, Schneider falsely claimed that Plaintiff was "encouraging clicks" and that doing such was a direct violation of the Beehiiv Ad Network policies.  In addition to Plaintiff never signing or agreeing to policies specific to the "Beehiiv Ad Network," there were no visibly published policies on the Beehiiv website specific to the Ad Network, nor was there anything listed in the general Terms of Use. Furthermore, Plaintiff was not "encouraging" clicks but rather complying with laws governed by various government agencies, including the Federal Trade Commission ("FTC").  The FTC's Endorsement Guides require clear and conspicuous disclosures of material connections (e.g., payment for endorsements) in sponsored content. When Schneider responded by suggesting Plaintiff speak with an attorney, Mr. Lynch believed that was a sign of uncertainty on Beehiiv's part, which is what led Mr. Lynch to investigate and find that his disclaimer was not only in good standing with the laws, but that the vagueness in Beehiiv's disclaimer was toeing a line he did not wish to engage in.  To further test Schneider's claim, Mr. Lynch sent a few Newsletters without

the disclaimer and observed no difference in ad revenue increasing or decreasing, thus showing that the disclaimer had no effect on "encouraging" clicks. Additionally, a reader had asked Mr. Lynch why he would "sponsor an ad" on his Newsletter, meaning the reader was confused by the vagueness of the "Sponsored Ad" language provided by Beehiv and thought Mr. Lynch was paying the advertiser rather than the other way around, further illustrating the need for explicit transparency to prevent deception.

60. This lack of transparency often results in penalties from the FTC of $51,000.00 per violation.

61. By June 30, 2025, collectively, the revenue from all three Newsletters was a record-breaking number for the Plaintiff. This was followed by Schneider sending a second email to Mr. Lynch on July 3, 2025:

> Hi Dennis, I hope you're doing well. I'm reaching out to flag multiple serious issues we've identified across your beehiiv account(s) that require immediate attention. After a deeper review, we've uncovered several violations of our platform and Ad Network policies. These include:
>
> 1. Suspicious Activity & Artificial Click Inflation
> We've detected abnormally high ad earnings likely driven by:
> - Duplicate subscriber activity across multiple publications
> - Use of language encouraging users to click on ads (previously flagged)
> - Evidence of large-scale self-engagement from email addresses likely controlled by you or your team
>
> 2. Spam & List Quality Issues
> - Sending practices that have resulted in your domains being flagged for spam trap hits
> - Subscriber acquisition methods inconsistent with industry standards
>
> 3. Platform Abuse
> - Creation of multiple publications (now four, including DML360) using the same subscriber lists
> - Attempting to circumvent enterprise pricing by duplicating audiences across separate accounts

These actions not only violate our terms but also threaten the integrity of the beehiiv Ad Network and risk the trust we've built with advertisers. What happens next: We are actively reviewing your ad performance and will likely adjust earnings tied to illegitimate activity. Additionally, unless these issues are immediately addressed, your account is at risk of being:
-   Removed from the Ad Network
-   Demonetized (earnings lowered or revoked)
-   Permanently removed from the beehiiv platform

We're open to a conversation to determine if a path forward is possible, but that window is closing quickly. We are off tomorrow for the 4th but please let us know if you are free to set up a meeting next week to talk through this more.

62.     Mr. Lynch promptly responded to the email on July 4, 2025, copying Denk, denying all the allegations and providing explicit details outlining why the allegations were false, discrediting every allegation in the process, and requesting back-up data to support Beehiiv's fictitious claims.

63.     Denk responded to Mr. Lynch on July 7, 2025, with a vague reply, offering little support or data to substantiate the claims but making deeper allegations against Mr. Lynch.  His email read:

Hey Dennis, Thanks for the thorough response and apologies for the delay in getting back to you. We are by no means criticizing the quality of your work, or the legitimacy and dedication of your audience. This was simply outreach regarding ad abuse detected by our systems.

We have very advanced machine learning models that pick up abuse with a high degree of certainty, and since leveraging these models for the past 6 months, there hasn't been a single false positive where there was not some level of abuse uncovered. We typically don't share our findings, but I'm happy to give you very concrete evidence that you can track for yourself:

— There are more than 35+ addresses tied to @dmlteam.com and @dmlcbd.com that click on legitimately every single advertisement. I would understand if you and Ryan need to click on a link once to confirm it works, but there is no justifiable reason for your entire team and associated accounts to click on every single ad on every single send (especially when it is for the same advertisers). If you assume a $3.00 CPC, that is costing our business  ~$100 every single time you send an email, directly out of our pocket.

— There is also strong evidence beyond just the @dmlteam.com and @dmlcbd.com email addresses that there are additional personal accounts being leveraged clicking on every single ad as well, which we can track with our sophisticated ML systems and leveraging basic metadata like IP addresses, user agents, device types, etc.

— Those are the easiest to track and communicate, but your accounts have been flagged numerous times by our internal systems that leverage just raw data points to find anomalies.

tl;dr this isn't selective cherrypicking, this is all based on real data.

Our team has given a lot of time and effort to ensuring your success on the platform. I don't think it's necessarily fair to engage in this level of abuse and somehow flip it onto us as if we are the ones at fault here.

We have removed hundreds of users from the beehiiv platform due to abuse to a much lesser extent, but I've communicated to the team to continuously give you additional chances. Regarding your theory that there is something larger at play here — I can confirm that there is not. We have 35K+ active publishers on the platform, and you have admittedly gotten more time and attention than 99.9% of them. As much as I'd love to, we don't have the bandwidth to do one off-deals and partnerships with all of our publishers at this scale.

Ultimately, our internal systems have estimated that 40-50% of the clicks generated in June were likely fraudulent. Any other user would have been automatically removed from the platform for this. Rather, we are allowing you to remain on the platform but need to recoup 35% of your estimated payout for July to offset the fraudulent activity. I hope that all makes sense and clears things up."

64.     Denk's July 7, 2025, email failed to provide any clarification, substantiation, or verifiable data—instead, it laid bare Beehiiv's allegations as a pretextual sham, riddled with factual contradictions, utterly unsupported by evidence, and irrefutably demolished by Beehiiv's own platform records, Plaintiff's contemporaneous analytics, six months of unequivocal praise and approvals, and industry-standard practices in email newsletter publishing (where subscribers opt-in voluntarily to receive branded content from the same publisher across multiple themed newsletters, deliverability is maintained through cautious list-building, and engagement is

measured by open rates—the percentage of recipients who actually view the email—and click-through rates, reflecting genuine interest).

65.    By way of example, at the beginning of this email, Denk writes, "We are by no means criticizing the quality of your work, or the legitimacy and dedication of your audience," but then contradicts himself by writing, "our internal systems have estimated that 40-50% of the clicks generated in June were likely fraudulent."

66.    Mr. Lynch immediately eviscerated every allegation in detailed, evidence-based responses, proving each false as follows:

**—No "Duplicate Subscriber Activity," "Platform Abuse," or "Circumventing Enterprise Pricing"**: Beehiiv knew and expressly approved—from January 20, 2025 onward—Plaintiff's business model of separate, lower-tier accounts for thematically distinct newsletters (e.g., political reporting in *The 47 Report*, health in *DML Health*, opinion in *DML Report*, general lifestyles in *DML360*). Berk personally recommended this approach to safeguard each domain's sender reputation during gradual, batched imports of Plaintiff's 107,000+ authentic opt-ins (avoiding spam triggers). Plaintiff paid substantially more (~$1,500/month vs. ~$850 for a single Enterprise account)—no circumvention, only compliance. Overlapping subscribers is entirely legitimate: Readers voluntarily opted into multiple newsletters via Plaintiff's website (DennisMichaelLynch.com) and Beehiiv's own opt-in tools, as is routine for multi-publication publishers building loyal, cross-engaged audiences. Platform abuses? Beehiiv offered zero explanation for this baseless claim; Plaintiff strictly used the platform according to Beehiiv's provided tools for multi-publication management. No complaints in addition to Denk's VIP sign-offs on all uploads.

**—No "Language Encouraging Users to Click on Ads"**: Plaintiff's disclaimers were exemplary FTC compliance—clear, conspicuous disclosures of material connections (payment for sponsored content) to prevent consumer deception, per 16 C.F.R. § 255 (Endorsement Guides). Vague "Sponsored" labels confused readers (e.g., one asked Plaintiff: "Why would you sponsor an ad?", mistaking it for Plaintiff paying the advertiser). Conclusive proof of zero manipulation: Mr. Lynch sent multiple newsletters sans disclaimers—identical click-through rates and revenue. No inflation whatsoever.

**—No "Large-Scale Self-Engagement," "Artificial Click Inflation," or "40-50% Fraudulent Clicks"**: Denk's claim of Plaintiff operating "35+ @dmlteam.com/@dmlcbd.com addresses" and nebulous "additional personal accounts" is unsubstantiated. (i) Plaintiff does not host a "dmlteam.com" URL or

email account. (ii) Plaintiff's six-person family team (with discreet, individual emails) routinely quality-testing every link for functionality, compliance, and reader value—absolute industry standard, totaling immaterial volume (<1% of thousands of organic daily clicks from 50-65% open rates). Mr. Lynch provided Beehiiv with the 16 emails address that his family (team) uses for both personal and business, and only a small handful clicked the ad links for testing purposes. (iii) When Mr. Lynch requested the list of 35+ email addresses for review, fearing there may be bots impersonating his team, Beehiiv withheld the alleged email list. (iv) Mr. Lynch explained to Denk there was no way his team could be generating thousands of fraudulent clicks if for no other reason that his layman team (family) is not proficient in the sort of technology that required to carry large scale "click farms". Denk knew this to be true per many of Plaintiff's inquiries about how to use some of Beehiiv's technical features over six months. (v) Beehiiv refused to back up its accusations of fraudulent clicks with IP addresses, user agents, or raw data despite repeated demands, hiding behind "advanced machine learning models" (unreviewable "black-box AI" newly deployed, inherently unreliable, and never agreed to as an arbiter of authenticity). Mr. Lynch's forensic review using Google Gemini, OpenAI, and Grok of Beehiiv-provided click logs revealed that all click patterns were pristine, and fully industry-normal. Despite Denk's claims that Beehiiv's advance Artificial Intelligence models were 100% accurate, Beehiiv has continuously reported issues with its various technologies including, but not limited to, its website builder. Denk ignores that the leaders in Artificial Intelligence such as Elon Musk and OpenAI (ChatGBT) report that even the most sophisticated systems are inaccurate thirty-three (33%) percent of the time.

**—No "Spam Trap Hits," "Poor List Quality," or "Inauthentic Subscribers"**: Absurd on its face—Plaintiff's consistent 50-65% open rates (double industry average of 20-30%, eclipsing Beehiiv CEO Denk's own 42%) conclusively prove premium, engaged audiences (impossible for spam/fraudulent lists). Plaintiff's email subscribers were routinely auto-cleaned via Beehiiv's proprietary system (flagging/removing invalids);  with every new batch imported reviewed/approved by Denk/Berk personally. Mr. Lynch also guaranteed that his lists were not purchased or rented from third-party lists, a fact that can be verified easily. "Spam traps" (inactive test addresses used by ISPs/email providers to detect spammers)? Universal industry reality—never once raised in six months of flawless performance.

**—No "Subscriber Acquisition Methods Inconsistent with Industry Standards":** Plaintiff and Mr. Lynch come with stellar reputations with no credible claims against them for twenty years since entering the media industry.  Plaintiff's list building was and is 100% ethical, opt-in only: Subscribers voluntarily registered via Plaintiff's verified websites (TeamDML.com, DennisMichaelLynch.com, DMLcbd.com, True.News) and Beehiiv's embedded forms/pop-ups. Plaintiff's lists include no bots, or coercion. All batches pre-vetted/approved without issue by Beehiiv and Denk.

Beehiiv's ensuing conduct constituted egregious, unilateral breaches:

—There should be no withholding of 35% of earned revenue, an arbitrary number constructed by Denk. Even if such a clause was agreed to by Plaintiff, which it was not, Denk's claim is up to fifty (50%) percent of clicks were fraudulent and yet, Beehiiv penalized 100% of Team DML's Newsletters, even those that were to be paid based on CPM versus CPC

67.     This random and haphazard penalization of Plaintiff exemplifies Defendants feigning allegations against Plaintiff and its president, Dennis Michael Lynch, as false justification for their improper failure to pay monies owed by Beehiiv to Plaintiff and creating a false basis to "fire" Team DML from Beehiiv.

68.     To falsely justify its 35% reduction of Plaintiff's June revenue, Defendants fraudulently altered their own verified click data on every one of Plaintiff's emails sent across all three Newsletters that included an ad.  In some cases, Defendants went as far as eviscerating verified clicks by the thousands and/or by more than 65% (e.g., 2,500 → 322; 1,000 → 300). Defendants went a step further by retroactively falsifying data to slash payouts by unilaterally gutting agreed CPC rates; for example, they changed a contractually-agreed upon $3.20 down to $2.80 in order to deduct money from Plaintiff.

69.     **No Contractual Basis Exists**: Plaintiff never signed—nor was offered—any "Beehiiv Ad Network" agreement (nowhere on Beehiiv's website, Terms of Use, or Publisher Agreement). Zero provisions authorize AI "fraud" policing (experimental, error-prone technology unproven for binding judgments), unilateral deductions, data alterations, or revenue overrides. Post-record June revenue, Beehiiv invented this farce to shirk obligations after lavishing VIP perks.  Beehiiv has general terms of service agreement.  When you sign onto the Beehiiv Ad Network, no additional terms of use, publisher agreement or the like is provided.  As such, Defendants' decisions to override revenue earned by Plaintiff can only be described as arbitrary,

random and, again, false justification for their improper failure to pay monies owed by Beehiiv to Plaintiff.

70.     Schneider demanded telephonic discussions but both he and Denk intentionally failed to communicate with Plaintiff for weeks after Defendant levied the false accusations detailed above.  On July 7, 2025, Mr. Lynch requested that Denk make time for a 15-minute phone call, writing: "Tyler, I would like just you and I to have a 15-min call.  Humbly, with the accusations being made against my family and me, I ask you to space some time."  Denk responded on the same day: "I'm underwater with end of quarter and board meeting and such at the moment. I'm only stepping in to prevent them from removing you from the platform, and would prefer if you can handle with the team async via email."

71.     To date, Beehiiv has provided **no supporting data whatsoever** to substantiate its outrageous claims, thereby constituting bad faith on Defendants' part.  In an email to Denk during the contentious period following the baseless claims being made by Defendants, Mr. Lynch suggested that Beehiiv was removing Plaintiff's accounts because they didn't like his politics. Denk denied this to be true but, when Mr. Lynch then pressed for data to back up the claims, and asked Denk why no advertiser had ever complained about Plaintiff, Denk would not (because he could not) provide answers.  Mr. Lynch then offered Denk free ads for any advertiser who felt it was harmed by Plaintiff, including ads on Mr. Lynch's Facebook page, reaching 1.3 million people at no cost for 30 days.  Denk never responded to the offer.  He did however write, "I am trying to keep you on our platform."  Thus, suggesting it was not Denk who demanded Plaintiff be removed, but rather his management team including persons such as Jake, Schneider and Berk.

72.     Mr. Lynch has asked why, if Plaintiff had carried out many horrific and dishonest allegations, was it permitted to remain on the Beehiiv Platform and Ad Network.  Despite the

claims made against Plaintiff, and the fraudulent actions by Beehiiv of changing click data to support the fraudulent reduction in revenue money due to Plaintiff, Beehiiv continued to offer Plaintiff ad opportunities. During the first week of July 2025, Plaintiff generated nearly $10,000.00 in income before Beehiiv shut down its access to the Beehiiv Ad Network.  And even when Defendant blocked Plaintiff from running ads, it kept Plaintiff's multiple accounts (47 Report, DML Health, DML Report) open and continued to bill each account, collecting payments via Mr. Lynch's American Express credit card account.

73.     It was not until Mr. Lynch informed Denk that he had screenshots and videos showing how and when Beehiiv changed the verified click data and confirmed amounts earned from each ad ran in June, and that he would be hiring an attorney if he was not paid the full amount due and reinstated into the Ad Network that Plaintiff was removed by Denk from the Beehiiv platform without warning.

74.     On July 21, 2025, Mr. Lynch sent an email to Denk demanding all data from his accounts, and emails between Beehiiv employees about is account be preserved.  Even though Mr. Lynch repeated this demand on three other occasions, he received no confirmation of compliance by Defendants.

75.     On or about July 25, 2025, Beehiiv paid Plaintiff approximately fifty (50%) percent of the total revenue captured for by all three Newsletters for the month of June.  In addition, none of the revenue captured for July, prior to being removed from the Beehiiv Ad Network, has been paid by Defendants to Plaintiff.

76.     By way of clarification, the following highlight examples of additional specific wrongful acts committed by Defendants:

- Plaintiff was earning $3.20 per "click" on an advertisement, confirmed by the fact that, on June 26, 2025, Defendants emailed Plaintiff showing that it was to be paid $2,928.00

for 915 "clicks" and yet on June 28, 2025, Defendants posted to Plaintiff's account showing a fraudulently edited report confirming Plaintiff would be paid only $1,763.20 for 551 "clicks."

-    Prior to June 30, 2025 and July 8, 2025, Defendants began transmitting emails to Plaintiff indicating amounts of "ads payout" that were inconsistent with the "per click" amounts previously agreed to.

-    For example, by email dated July 27, 2025, Defendants emailed Plaintiff showing that it was to be paid $2,374.40 for 848 "clicks", yielding a lower rate of $2.80 per "click" instead of the agreed upon $3.20.

-    On July 20, 2025, Defendants emailed Plaintiff indicating a total "ads payout" for DML Report in June 2025 of $16,959.97 when, in truth, Plaintiff's DML Report earned $32,500.60.

## AS AND FOR A FIRST CLAIM
### (Breach of Contract against Beehiiv)

77.    Plaintiff repeats, reiterates and realleges each and every statement set forth above, as if more fully set forth at length herein.

78.    The Contract was a binding agreement between the parties.

79.    By complying with all terms of the Contract, the Terms of Use, and any and all other demands of Beehiiv, Plaintiff complied with the terms of the Contract.

80.    By taking the actions described above including, but not limited to (i) reducing the number of ads for Plaintiff, (ii) reducing the amount paid "per click" to Plaintiff and (iii) removing Plaintiff from Beehiiv's platform, Beehiiv breached the Contract.

81.    As a result of Beehiiv's breaches, Plaintiff has been damaged.

82.    Accordingly, Plaintiff is entitled to judgment in an amount to be determined at trial, but not less than $630,000.00, plus interest, costs and attorneys' fees.

## AS AND FOR A SECOND CLAIM
### (Fraud against all Defendants)

83.    Plaintiff repeats, reiterates and realleges each and every statement set forth above, as if more fully set forth at length herein.

24

84.    Defendants made numerous misstatements to the detriment of Plaintiff including, but not limited to:

- Denk and Schneider falsely stated that Plaintiff's email lists were inauthentic and of poor quality, belied by the fact that (i) Plaintiff had "open rates" of 50%-65%, far in excess of the industry standard of 20%-30% and Beehiv's own rate of 42%, (ii) the list was processed through Beehiv's own cleaning system that would remove any invalid email addresses and (iii) praise given to Plaintiff by Beehiv's own employees and representatives;

- Denk and Schneider alleged that 40%-50% of the "clicks" received by Plaintiff were "fraudulent", but never defined what "fraudulent" means and

- Denk falsely alleged that more than 35 of the email addresses provided by Plaintiff were improperly associated with Plaintiff's businesses, but never provided any of these email addresses to Plaintiff for investigation.

85.    Denk and Schneider knew these accusations to be false.

86.    As a result of these fraudulent statements and actions, Plaintiff was damaged.

87.    Accordingly, Plaintiff is entitled to judgment in an amount to be determined at trial, but not less than $630,000.00, plus interest, costs and attorneys' fees.

88.    Based on Defendants' willful and contumacious conduct, Plaintiff is further entitled to an award of punitive damages in an amount to be determined at trial, but not less than $500,000.00, plus interest, costs and attorney's fees.

## AS AND FOR A THIRD CLAIM
### (Breach of Implied Duty of Good Faith and Fair Dealing)

89.    Plaintiff repeats, reiterates and realleges each and every statement set forth above, as if more fully set forth at length herein.

90.     Implicit in every contract is a covenant of good faith and fair dealing, which encompasses any promise that a reasonable promisee would understand to be included.

91.    Pursuant to this doctrine, neither party may do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

92.    Here, by taking the actions described above including, but not limited to (i) reducing the number of ads for Plaintiff, (ii) reducing the amount paid "per click" to Plaintiff and (iii) removing Plaintiff from Beehiiv's platform, Beehiiv breached the covenant of good faith and fair dealing.

93.    As a result of Beehiiv's breach of this covenant, Plaintiff has been damaged.

94.    Accordingly, Plaintiff is entitled to judgment in an amount to be determined at trial, but not less than $630,000.00, plus interest, costs and attorneys' fees.

## AS AND FOR A FOURTH CLAIM
### (Unjust Enrichment)

95.    Plaintiff repeats, reiterates and realleges each and every statement set forth above, as if more fully set forth at length herein.

96.    Defendants were enriched by Plaintiff's Newsletters being serviced by Beehiiv.

97.    Defendants' enrichment is at the expense of Plaintiff, who was denied the monies described above.

98.    It is against equity and good conscience to permit Defendants to retain the benefits of Plaintiff's Newsletters without providing the monies owed.

99.    Accordingly, Plaintiff is entitled to a monetary award under a theory of unjust enrichment.

100.    As a result of the foregoing, Plaintiff is entitled to judgment in an amount to be determined at trial, but not less than $630,000.00, plus interest, costs and attorney's fees

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

a.    On its First Claim for Breach of Contract, an amount to be determined at trial, but not less than $630,000.00, plus interest, costs and attorneys' fees;

b.    On its Second Claim for Fraud, an amount to be determined at trial, but not less

than $630,000.00, plus interest, costs and attorneys' fees;

    c.  On its Third Claim for Breach of Implied Duty of Good Faith and Fair Dealing, an amount to be determined at trial, but not less than $630,000.00, plus interest, costs and attorneys' fees;

    d.  On its Fourth Claim for Unjust Enrichment, an amount to be determined at trial, but not less than $630,000.00, plus interest, costs and attorneys' fees;

    e.  Punitive damages in an amount to be determined at trial, but not less than $500,000.00, plus interest, costs and attorneys' fees;

    f.  Any and other awards determined to be just and proper.

Dated: Garden City, New York
      November 17, 2025

ROMANO & ASSOCIATES

_____

Michael J. Romano, Esq.
*Attorneys for Plaintiff*
350 Old Country Road, Suite 205
Garden City, New York 11530
Tel. (516) 248-8880
mjr@romanofirm.com